**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

JAY CONNOR, individually
and on behalf of a class of all persons and
entities similarly situated,

      Plaintiffs,

vs.

                                      Case No. 2:25-cv-07135-DCN

JF MARKETING & SUPPORT LLC,

RASHID AWAN

AREAHOU DIAGNOSTICS LLC,

and ICY-TELE SOLUTIONS LLC

      Defendants

## <u>CLASS ACTION COMPLAINT</u>

### Preliminary Statement

1.      "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

2.      "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal

1

government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. See id.; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. Id…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 649-50 (4th Cir. 2019).

3.      Plaintiff Jay Connor ("Plaintiff") brings this action alleging Defendants JF Marketing and Support LLC, Rashid Awan MD, Areahou Diagnostics LLC, and Icy-Tele Solutions LLC ("Defendants") violated the  TCPA for contacting his number that he placed on the National Do Not Call Registry.

4.      Plaintiff also brings this action pursuant to the South Carolina Telephone Privacy Protection Act ("SCTPPA"), S.C. Code § 37-21-10 *et. seq*.

5.      The SCTPPA prohibits a company from making a call to a South Carolina telephone number that had been registered on the Do Not Call Registry, as Plaintiff's was prior to receiving the call.

6.      Plaintiff and putative class members never consented to receive these calls.

7.      Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers en masse, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

8.      A class action is the best means of obtaining redress for the Defendants' wide-scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

### Parties

9.      Plaintiff resides in Charleston County, South Carolina.

10.     Defendant JF Marketing and Support is a limited liability company located in Florida.

11.     Defendant Rashid Awan is a physician licensed in California who bills Medicare for telehealth and genetic testing services.

12.     Defendant Areahou Diagnostics LLC is a genetic testing laboratory located in Texas that processes genetic tests.

13.     Defendant Icy-Tele Solutions LLC is a California telephone services company that served as an intermediary between JF Marketing and Dr. Awan.

### Jurisdiction & Venue

14.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227 et seq. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the SCTPPA claims as they arise from the same case and controversy, the telemarketing campaign of the Defendants.

15.     The Court has specific personal jurisdiction over the defendants because the calls

3

at issue were made into this District.

16.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim—namely, the calls to Plaintiff—occurred in this District.

## Statutory Background

### The TCPA

17.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

18.     In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

19.     § 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

20.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

21.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

22.     FCC regulations also expressly require companies that engage in telemarketing to implement certain policies and procedures for maintaining an internal do not call list. 47 C.F.R. §

4

64.1200(d).

23.     Courts across the country have held that the 47 U.S.C. § 227(c)(5) provides a private right of action for claims premised on violations of the TCPA implementing regulations promulgated pursuant to 47 U.S.C. §§ 227(c)(1)-(4), including for example claims under 47 C.F.R. § 64.1200(d).

24.     To engage in telemarketing, a company's do not call list procedures must satisfy six specific minimum requirements. 47 C.F.R. §§ 64.1200(d)(1)-(6).

25.     One of them is maintaining an internal do not call list. *Id*. at § (d)(6).

26.     Another is training personnel regarding the existence and use of the internal do not call list. *Id*. at § (d)(2).

27.     And still another is recording do not call requests and complying with them. *Id*. at § (d)(3).

28.     If a company fails to satisfy any one of these requirements, it is not entitled to engage in telemarketing (and violates the law by doing so), regardless of whether it satisfies all of the regulation's other requirements.

29.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are made.  47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

The SCTPPA

30.     On May 18, 2018, the State of South Carolina signed into law the South Carolina Telephone Privacy Protection Act, S.C. Code § 37-21-10 *et. seq*.

31.     The SCTPPA prohibits, *inter alia,* a party from initiating, or causing to initiate, a

5

telephone solicitation to a South Carolina telephone number that has been listed on the National Do Not Call Registry. *See* S.C. Code § 37-21-70.

32.    The SCTPPA allows for aggrieved individuals to initiate an action and recover $1,000 for each negligent violation and $5,000 for each willful violation of the SCTPPA. S.C. Code § 37-21-80.

**Factual Allegations**

Calls to Plaintiff

33.    Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

34.    Plaintiff's telephone number, (843) XXX-XXXX has been on the National Do Not Call Registry since 2009.

35.    The telephone number is for personal calls.

36.    The telephone number is Plaintiff's residential line.

37.    Plaintiff never provided his prior express written consent to receive telemarketing calls from Defendants.

38.    Despite this, Plaintiff received at least eight telemarketing calls from Defendants.

39.    The first call came in on April 16, 2025 at 3:26 PM from Caller ID (843) 707-9862.

40.    Plaintiff answered and spoke with an individual identified as "Mike" from the illegal fake name "Genetic Advocate Lab" who stated he was calling to offer Plaintiff what turned out to be an Areahou Diagnostics genetic testing kit.

41.    Plaintiff answered multiple questions and provided his father's information in an effort to get more information about Defendants' company.

6

42.     Plaintiff said he did not want any more calls.

43.     Despite Plaintiff's request, approximately two hours later at 5:33 PM, Plaintiff received a call from "Mike" again at (770) 585-9667.

44.     Plaintiff reminded "Mike" of the do not call request and he hung up.

45.     The third call came in the next day on April 17, 2025 at 10:51 AM from Caller ID (864) 651-1417.

46.     Plaintiff again spoke with "Mike" and then was subsequently transferred to two additional people, including a representative of Defendant Icy-Tele Solutions LLC, before finally speaking with the Defendant Rashid Awan, who is a doctor.

47.     Plaintiff answered a series of questions from Dr. Awan related to the Areahou Diagnostics genetic testing kit.

48.     Subsequent to this call, Plaintiff received a genetic swab testing kit via UPS.

49.     The requisition sheet accompanying the testing kit identified the source of the kit as being from Dr. Rashid Awan and JF Marketing and Support.

50.     The paperwork also identified that the kit was to be shipped to Areahou Diagnostics, the Defendant and diagnostic laboratory.

51.     The fourth call came in on April 21, 2025 at 3:45 PM from Caller ID (561) 237-8453.

52.     Plaintiff missed this call.

53.     The fifth call came in less than one hour later at 4:36 PM from the same Caller ID.

54.     Plaintiff answered the call and spoke to a different individual identified as "Michael" who informed him he was calling from Areahou Diagnostics and wanted to confirm Plaintiff received the genetic testing kit.

7

55.     Plaintiff refused to answer questions and eventually hung up the phone, indicating to the caller that he did not want further calls.

56.     The sixth call came in on May 2, 2025 at 3:04 PM from Caller ID (970) 459-9535.

57.     Plaintiff answered and again spoke with "Mike."

58.     Plaintiff was eventually transferred to individuals identified as "Paul," "Jamie" and "Kara" and answered a series of questions related to his health and genetic testing.

59.     "Kara" indicated she was calling from the illegal fictitious name "AEM Diagnostics."

60.     Upon information and belief, Defendant Areahou Diagnostics uses the acronym AEM to hide the fact that it is illegally and fraudulently billing Medicare for genetic testing kits sold by telemarketing calls.

61.     The seventh call came in on May 5, 2025 at 4:03 PM from Caller ID (559) 478-8814.

62.     Plaintiff answered and spoke with "Jonathan" who identified himself as being from the illegal fictitious name "Patient Care Services" and was calling about the genetic testing kit with a nearly identical script as the May 2 call.

63.     The eighth and final call came in on May 7, 2025 from Caller ID (302) 779-9695.

64.     Plaintiff answered and spoke with "Paul Smith" who was the same "Paul" from the call on May 2, 2025.

65.     "Paul" referred to his May 2, 2025 conversation with Plaintiff about a genetic testing kit.

66.     Plaintiff again requested Defendants not contact him.

67.     Defendant Awan has claimed not to have a direct relationship with Defendant JF

8

Marketing.

68.    Instead, Defendant Icy-Tele served as the intermediary between Defendant Awan and Defendant JF Marketing.

69.    Upon information and belief, Defendant JF Marketing would place calls and refer only the interested clients to Defendant Icy-Tele.

70.    Icy-Tele would then screen the patient and, if the patient meets the criteria for a referral to Dr. Awan, would make such referral to Dr. Awan.

71.    It is Plaintiff's understanding, based on communications with Icy-Tele's counsel, that Icy-Tele benefitted from both sides of the transaction. Dr. Awan would pay Icy-Tele for each client for whom Icy-Tele conducted an intake, and JF Marketing would pay Icy-Tele for each intake transferred to Icy-Tele.

72.    Based on the foregoing, it is evident that Defendants mass-dialed calls indiscriminately and incessantly, including to numbers on the Do Not Call Registry.

73.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

74.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

75.    The FCC has instructed that sellers such as Awan and Areahou may not avoid liability by hiding behind third party agents and outsourcing telemarketing operations to third parties, such Icy-Tele and JF Marketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective

remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

76.    In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

77.    Awan and Areahou are vicariously liable for the conduct of Icy-Tele and JF Marketing and the telemarketing calls placed by JF Marketing and/or Icy-Tele, transferred through Icy-Tele, and routed to Awan to generate customers for Awan and Areahou, including the Plaintiff.

78.    Moreover, with full knowledge that JF Marketing was violating the TCPA do not call registry provisions, Awan and Areahou did nothing.

79.    Awan and Areahou thus had full knowledge of Icy-Tele and JF Marketing's illegal conduct and did not terminate or discipline them, thus implicitly ratifying their actions and endorsing their illegal behavior.

80.    The aforementioned facts demonstrate that Awan and Areahou failed to supervise Icy-Tele or enforce their compliance with applicable laws and regulations, and that Icy-Tele likewise failed to supervise JF Marketing.

81.     The aforementioned facts also demonstrate that Awan and Areahou failed to supervise Icy-Tele and JF Marketing or enforce their compliance with applicable laws and regulations.

82.     Awan and Areahou were interested in hiring a lead generator that could vet potential clients and only transfer them the interested ones. Awan contracted with Icy-Tele to provide them.

83.     To do so, Icy-Tele procured call transfers from JF Marketing, LLC, its own vendor/contractor, and provided and transferred those calls to Awan for the sale of Areahou kits.

84.     Indeed, Awan's and Areahou's relationship with Icy-Tele and JF Marketing contains numerous hallmarks of agency.

85.     As an initial matter, Awan supplied the medical requisition function necessary to monetize the lead for the Areahou kit. Without his assessment and sign-off, the kit sale could not be completed.

86.     Awan's control extended to the manner in which the "assessment" itself was conducted. Rather than exercising independent medical judgment, Awan administered the same battery of scripted questions previously posed by JF Marketing's and Icy-Tele's non-physician representatives demonstrating that the content and sequence of the "medical" encounter was dictated by a protocol common to the entire enterprise, not by Awan's independent clinical judgment.

87.     Tellingly, when Awan did attempt to exercise independent medical judgment and Mr. Connor could not identify the medications he was on, Awan proceeded to complete the assessment and sign off on the order regardless. This demonstrates that Awan's practical authority to decline an order was subordinate to the network's business objective of monetizing

the lead, further evidencing that Awan operated within, and under the control of, a scheme administered by Icy-Tele and JF Marketing rather than as an independent treating physician exercising unfettered clinical discretion.

88.     Moreover, JF Marketing's own representative told Mr. Connor, before Awan or Icy-Tele had even come on the line, that the medical provider he would be speaking with would be Icy-Tele, before later confirming that it was Dr. Awan.

89.     JF Marketing's ability and willingness to do so demonstrates the degree of operational control it (and by extension Icy-Tele, Awan, and Areahou, as the ultimate beneficiaries of the completed order) exercised over the process culminating in Awan's sign-off, since it shows JF Marketing knew who all the players would be before even transferring the call to Icy-Tele, and then, Awan, for the Areahou kit.

90.     Awan's participation in, and adoption of, this seamless, single continuous call, moving without interruption from lead generation (JF Marketing) through verification and compliance (Icy-Tele) to his own purported independent medical assessment, is itself evidence that Awan held out Icy-Tele and JF Marketing as acting on his and Areahou's behalf, and that Icy-Tele and JF Marketing were in fact acting within the scope of authority actually or apparently granted to them by Awan and Areahou.

91.     Nor was Mr. Connor ever given any indication that he was dealing with multiple, independent entities. To the contrary, when Mr. Connor directly asked JF Marketing's own agent whether the "telehealth company" was separate from "Senior Medical" (i.e., the illegal fake name alias used by JF Marketing), the agent responded unequivocally: "Oh, no, we're all together... We just have different jobs, different moving pieces throughout the company." This is a direct admission, made by JF Marketing's own agent in the course of, and for the purpose of,

12

closing the very transaction at issue, that Icy-Tele, Awan, Areahou, and JF Marketing operated as a single integrated enterprise rather than as independent principals.

92.    Further compounding this admission, as explained above, JF Marketing's own representative could accurately identify the names of the entity that would ultimately bill Mr. Conner's Medicare benefits, confirming both Icy-Tele and TeleSolutions MD, the name of Dr. Awan's telemedicine practice.  A front-line agent's ability to reliably state the identity of the billing principal is itself probative of a common enterprise and agency relationship as among Icy-Tele, JF Marketing, Awan, and Areahou.

93.    These facts, taken together, establish that Icy-Tele integrated and controlled JF Marketing's calling activities as part of a single continuous enterprise culminating in Awan's assessment and the sale of Areahou's kit, and that Awan and Areahou, in turn, exercised (or had the right and ability to exercise) control over that same enterprise, including the specific script, sequence, and compliance framework employed on every call, up to and including Mr. Connor's.

94.    Awan's, Areahou's, and Icy-Tele's failure to supervise, audit, or terminate JF Marketing despite actual or constructive knowledge of the manner in which calls such as the one at issue were being generated and conducted, including calls placed to numbers on the National Do Not Call Registry, in violation of the TCPA, constitutes ratification of JF Marketing's conduct, rendering Icy-Tele, Awan, and Areahou directly and/or vicariously liable for that conduct under the doctrines of actual agency, apparent agency, and ratification.

95.    By virtue of specifying the leads and call criteria it would accept, Awan and Areahou directed Icy-Tele, and through Icy-Tele, JF Marketing, as to the content, method, and criteria of the communications those entities used in their calling in order to meet the specified criteria.

96. A reasonable seller like Awan and Areahou whose agents are making thousands of call transfers per week on its behalf, and a reasonable intermediary like Icy-Tele, would investigate the methods by which those calls are generated.

97. They did not.

98. As such, Awan and Areahou knowingly ratified Icy-Tele's and JF Marketing's conduct.

99. And in the same manner, Icy-Tele ratified, in turn, JF Marketing's conduct as a subagent.

100. Awan and Areahou also ratified Icy-Tele's and JF Marketing's conduct because, with knowledge that they were hiring Icy-Tele to procure call transfers, and that Icy-Tele in turn was relying on JF Marketing to generate those customers, they accepted the transferred calls and attempted to sell products and services to the consumers on those calls, including the Plaintiff.

101. Awan accepted the call transfers from Icy-Tele/JF Marketing and utilized them for the commercial benefit of Awan and Areahou by promoting the kit to Plaintiff.

102. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

103. Here, JF Marketing is directly liable under the TCPA because it is the actual initiator of the subject calls. Icy-Tele is directly, or, minimally, vicariously, liable as the intermediary that JF Marketing to generated and transferred calls to and that received and re-

transferred those calls to Awan to sell Areahou's kit, and Awan and Areahou are vicariously liable for hiring Icy-Tele to procure call transfers on their behalf, for the campaign Awan sponsored and directed, and for accepting and monetizing those call transfers with full awareness of how they were generated.

104. The calls were unwanted.

105. The calls were nonconsensual encounters.

106. Plaintiff's privacy has been repeatedly violated by the above-described telemarketing calls.

107. Plaintiff never provided his consent or requested the calls.

108. Plaintiff and the Classes have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls disturbed them at early hours of the day, occupied their telephone message space, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## Class Action Allegations

109. As authorized by Rule 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff bring this action on behalf of classes of all other persons or entities similarly situated throughout the United States.

110. The classes of persons Plaintiff propose to represent are tentatively defined as:

**<u>National Do Not Call Registry Class</u>**: All persons in the United States whose (1) residential telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendants, (3) within a 12-month period, (4) at any time in the period that begins four years before the date of filing this

Complaint to trial.

**Internal Do Not Call Registry Class**: All persons in the United States whose (1) previously requested that their telephone numbers no longer at least 31 days previously, (2) but who received more than one telemarketing call from or on behalf of Defendants, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

**SCTPPA Class**: All persons with a South Carolina area code to whom (a) at any time from four years prior to the filing of the Complaint (b) Defendants, or someone acting on their behalf (c) placed at least one telephone solicitation to a number registered on the National Do Not Call Registry.

111.    Excluded from the classes are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

112.    The classes as defined above are identifiable through phone records and phone number databases that will be obtained through discovery.

113.    The potential class members number at least in the thousands, since automated telemarketing campaigns make calls to hundreds or thousands of individuals a day.  Individual joinder of these persons is impracticable.

114.    Plaintiff is a member of all classes.

115.    There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

• Whether the Defendants violated the TCPA by calling individuals on the National Do Not Call Registry or that had asked to previously no longer receive calls;

- Whether the Defendants placed calls without obtaining the recipients' prior consent for the call;

- Whether the Defendants violated the SCTPPA by making calls to South Carolina telephone numbers registered with the National Do Not Call Registry; and

- Whether Plaintiff and the class members are entitled to statutory damages because of the Defendants' actions.

116. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the classes, arise out of the same common course of conduct by the Defendants and are based on the same legal and remedial theories.

117. Plaintiff is an adequate representative of the classes because his interests do not conflict with the interests of the classes, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

118. In fact, the Plaintiff has foregone a simpler path to recovery by filing this matter as a putative class action, as opposed to an individual claim.

119. The actions of the Defendants are generally applicable to the classes and to the Plaintiff.

120. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

121. The likelihood that individual class members will prosecute separate actions is

17

remote due to the time and expense necessary to prosecute an individual case, and given the small recoveries available through individual actions.

## Legal Claims

## Count One

### Telephone Consumer Protection Act

### Violations of 47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c)  (On Behalf of Plaintiff and the National Do Not Call Registry Class)

122.     Plaintiff repeats the prior allegations of this Complaint and incorporates them by reference herein.

123.     The foregoing acts and omissions of Defendants constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making telemarketing calls, except for emergency purposes, to Plaintiff and members of the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

124.     Defendants' violations were negligent, willful, or knowing.

125.     As a result of Defendants' violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are presumptively entitled to an award of between $500 and $1,500 in damages for each call made.

126.     Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

## Count Two

18

**Violations of the TCPA, 47 U.S.C. § 227**

**(On Behalf of Plaintiff and the Internal DNC Class)**

127.    Plaintiff repeats the prior allegations of this Complaint and incorporate them by reference herein.

128.    Defendants placed numerous calls for telemarketing purposes to Plaintiff and Internal DNC Class Members' telephone numbers.

129.    Defendants did so despite not having a written policy pertaining to "do not call" requests.

130.    Defendants did so despite not training its personnel on the existence or use of any internal "do not call" list.

131.    Defendants did so despite not recording or honoring "do not call" requests.

132.    Defendants placed two or more telephone calls to Plaintiffs and Internal DNC Class members in a 12-month period.

133.    Plaintiff and Internal DNC Class members are entitled to an award of up to $500 in statutory damages per telephone call pursuant to 47 U.S.C. § 227(c)(5).

134.    Plaintiff and Internal DNC Class members are entitled to an award of treble damages in an amount up to $1,500 per telephone call, pursuant to 47 U.S.C. § 227(c)(5).

**Count Three**

**Violation of the SCTPPA**

135.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

136.    The SCTPPA prohibits, *inter alia,* a party from initiating, or causing to initiate, a telephone solicitation to an area code of the state of South Carolina to a number that is registered

19

on the National Do Not Call Registry.

137. The SCTPPA allows for aggrieved individuals to initiate an action and recover $1,000 for each negligent violation and $5,000 for each willful violation of the SCTPPA, as well as attorneys' fees and costs. S.C. Code § 37-21-80.

## Relief Sought

For themselves and all class members, Plaintiff request the following relief:

A.    Certification of the proposed classes;

B.    Appointment of the Plaintiff as representatives of the classes;

C.    Appointment of the undersigned counsel as counsel for the classes;

D.    A declaration that Defendants and/or their affiliates, agents, and/or other related entities' actions complained of herein violate the TCPA and SCTPPA;

E.    An order enjoining Defendants and/or their affiliates, agents, and/or other related entities, as provided by law, from engaging in the unlawful conduct set forth herein;

F.    An award to Plaintiff and the classes of damages, attorneys' fees, and costs, as allowed by law;

G.    Leave to amend this Complaint to conform to the evidence presented at trial; and

H.    Orders granting such other and further relief as the Court deems necessary, just, and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

DATED this 1 day of July, 2026.

PLAINTIFF,
By his attorneys,

By:    _s/ Dave Maxfield_____
David A. Maxfield, Fed ID 6293
P.O. Box 11865

20

Columbia, SC 29211
803-509-6800
855-299-1656 (fax)
dave@consumerlawsc.com